All right, madam clerk, please call the next case. In re MP Reorganization. Ryan Drexler appearing pro se Gregory Garmin for Appley. Right. All right. Mr. Drexler, we can't see you. All right, Mr. Drexler, you're the appellant. Would you like to reserve any time for rebuttal? I certainly would. Around four minutes, please. All right. Well, the clock is there. You could see it on your screen, I hope. And so just keep track of your time, but I'll try to remind you when you're getting close to your four minutes. Thank you. Thank you very much. Please go ahead. OK, so I think it's a little bit important to give the overview of the case. It's there's a lot of moving parts in this case. And then I kind of get into some of the details of what I think is really important. This kind of case centers around one individual, Empery's Ryan Matthew Lane. Mr. Lane initially provided funding for what was supposed to be a limited arm's length investment related to an uplisting. He was never intended to be involved in management decision making. But once he inserted himself, he became controlling, hostile and destructive. He treated he treated me as though I'd never invested a single dollar in the company, which I invested well over twenty million dollars. He insulted me, called me a liar. He openly forced the company through an Article 9 sale. What Mr. Lane didn't anticipate that I would later be forced to bankrupt the company and attempt to protect what was remained. The Article 9 sale would have stripped everybody of any ability to recover any money from the debtor. The biggest mistake I made was stepping down and trusting the process would be fair. From that point forward, Mr. Lane did everything possible to ruin my life, both professionally and personally, and obviously making sure that I didn't receive one dollar. I tried many times to sit down. I tried many times to mediate this. But obviously, he never wanted to. He wanted to make sure that I wasn't involved in the process at any step of the bankruptcy. And obviously, at the end of the day, he wanted to make sure that I worked walked away without any money. The bankruptcy plan was equivalently denied on the basis that basically I was put into a certain class and not a secure class, but a class that was just made for me that was underneath the creditors to make sure I wouldn't receive one dollar. I spent a significant amount of resources myself making sure this plan would never come to light. And I was very successful doing that. But then I was left with defending myself even more and spending even more money. Mr. Lane's actions went far behind business disputes and ended in personal vindictive territory. He made false statements to the SEC regarding my conduct and investment in the company. He threatened me directly, telling that I'd be broke and that he would kill me on a hill. He provided false information to law enforcement in an attempt to have me arrested. He made false accusations involving my family, none of which have ever been proven or sustained. He hired a handwriting expert to fabricate evidence, despite the fact that the expert had no legitimate handwriting samples. Mr. Lane's intimidation and tactics extended to my legal team. Several lawyers quit under pressure because of relentless interference, harassment, manipulation surrounding this case. On one occasion, Mr. Garman ambushed my counsel by converting an order to show cause into a TRO, proceeding without notice, effectively denying my due process and leaving my lawyer with no time to prepare. The bankruptcy process was engineered from the start to ensure my exclusion and my financial destruction. Mr. Lane was the architect of the plan. A plan that was to place me in a separate creditor's class, effectively isolating me and guaranteeing that I would not receive $1. This was not an accident. It was designed to intent to punish me for blocking the earlier Article 9 sale. He found the perfect ally to conduct the plan, Attorney Greg Garman, a lawyer for orchestrating of aggressive loan-to-own takeovers. Mr. Drexler, we're not going to engage in personal attacks in the argument here. So why don't we get to what we're supposed to talk about today, which is the motion for summary judgment and why that ruling was wrong. So let's go there. That's fine. Sorry, ma'am. So the summary judgment, there was one summary judgment we had before the plan was denied. That summary judgment was out with the court for a latter part of 10, 11 months. It was initially denied on both parties in December 31st of 2024. And then the wildfires happened in the state of California. The fires were very destructive. I was displaced. My lawyer was displaced. And our court date was coming up. I was excited for the court date. I thought the court date was going to be a time that we can bring evidence and key witnesses. Without us knowing, two weeks after the wildfires, we were asked to do a second summary judgment. And basically, which I felt was totally unfair because of the circumstances of the wildfires. My lawyer couldn't properly conduct and do a proper summary judgment. And I felt that with my due process, because I waited over a year and a half, that a trial was something that we would rely on to produce really good key evidence, which was never allowed to happen. So we put a summary judgment into play. The summary judgment was based on a lot of, let me just get to my notes over here. A lot of the disputes of facts, material facts. Mr. Garmin and Mr. Lane said I didn't have any real proof of putting money into the company. When Empire first came to give money to the company, I went into an intercredit and a subordination agreement. And they're very adamant about the part that they admitted that I was secured. Now, the reason they did that is to make sure that they were secured and they were senior secured, which was, I agreed to. But for them to say that I didn't put any money in there and there's no proof, there was plenty of proof. The key independent director who was put in a subordination agreement and the company would not allow me to get any paperwork. There was a tremendous amount of paperwork and board minutes and everything else. And I was never allowed to get any of that information. And I provided information of my bank accounts. But at that point, I felt I shouldn't have been, I shouldn't have had to do that. There was SEC, there was SEC filings that I put money into the company. We had an agreement. I had an agreement with Empire that I put money in the company. And for them saying that I didn't put not one diamonds to the company. And basically, a lot of the summary judgment was based upon that, I think was totally unfair. I feel that I should have been allowed my due process in court to talk about all those different points and to have a summary judgment two weeks before our court date. I was completely shocked of how that happened. And I think the other side was completely shocked. We're all ready to put our case on. Even though the natural disaster, we had to bring a lot of other people in from his firm to help him out. I wasn't allowed to put my case on. Basically, Empry and the professionals took all the money out of the estate. It was a very robust company. The problem is, why we went into bankruptcy is that basically, we buy protein powder. And at that time, because of COVID, the production of cheese wasn't plentiful. So our prices went up to 550. So that year, we lost a tremendous amount of money. So after they took over and I stepped down, the prices went back to $1.90. And the company was doing really, really well. But obviously, the professionals, Empry, they took all the money out. And not that I was asking for my money. I wasn't asking for my total money. We also went into a mediation with Judge Zive. And there was just these arguments, basically, was quite known that Mr. Lane was never going to offer me $1. He didn't want to. And it should show you from the summary judgment, that basically, it was a really unfair due process that I wasn't able to have my day in court. The damages for myself is that I spent a lot of money on lawyer fees. I spent a lot of money within the company. The sanctions and this TRO, which had nothing to do with the case, the judge allowed a TRO, which there was really an order to show cause on that day and allowed this and this TRO took over the case. And whatever feelings that me or Mr. Lane had, she had done nothing to do with the case, but the judge allowed that. And it didn't focus on the key parts of this case were that I had a contract with Empry. And in that contract, they said they would not damage my secured claim. And that's what they did from the beginning. And the summary judgment says that I didn't put money into the company, which is a total falsehood. So, my motion today is basically, is that there's key evidence in this case that I wasn't allowed to put on because of this TRO. There's discovery and not much discovery. There's seven or eight different people that I wanted to call that was never allowed to call. And I believe that it was due by design from Mr. Lane and Greg Garment. I spent well over $300,000 fighting this TRO and everything else. And it took away my ability to really have and focus on the core parts of this case, which is that I put money into this business and then showing why Empry created harm to myself. All I wanted was a fair shake of getting money. But the professionals and everyone else got money in this case, and no one else received $1. Right. You've got about three. I don't mean to interrupt you. You've got about three minutes left. Did you want to save the rest of your time, Mr. Drexler? Yes, I did. Yes. Thank you. All right. All right. Thank you. Mr. Garment, please go ahead. Yes, may it please the panel. My name is Greg Garment. I'm counsel to Empry Tax Efficient. Your Honors, there's obviously a great deal of emotion involved in this case. I'm going to spare some of that component. But I think the presentation you heard revolves around the fact that there's animosity associated with the temporary restraining order and a discovery sanctions order. Mr. Drexler believes that he has the right to a trial, notwithstanding the fact that there were no disputed issues of material fact. How do I know that? I have an order that says your motion is granted, his motion is denied, and it's based on what you said. How do I know that? Well, one, you know that, Your Honor, because there were cross motions for summary judgment brought by skilled counsel for Mr. Drexler. We both said these are the undisputed facts. This is the discovery record that exists. And we both thought to have summary judgment granted on the same issue. You raise an interesting issue, one that was not raised by the appellant himself, nor was it raised in the context. There was a lawyer involved who drafted the issues for appeal. So these are not issues on appeal that were not drafted by a lawyer who was involved in the underlying summary judgment motion. I think the parties clearly understand what the order is. And while best practices might be one in which orders contain everything within their four corners, it's not uncommon that orders refer to testimony at trial, testimony in discovery that exists outside the order. And so, you know, one of the great problems that I face in this appeal is there is no evidentiary citation to a record brought by the appellant. And so we attempted to the best we could to put a record before you that shows the factual rendition you heard is not only not supported by a record, it's not supported by a record for, among other reasons, that it's simply not true. The things that you heard are not true and they can't be pointed to in a record. It is not Mr. Lane who was found to have been harassing in this case. A temporary restraining order was issued by Judge Cox in which she found that this appellant was in fact harassing my client as a hedge fund. Well, it was in fact harassing the spouses of the employees of the hedge fund in public at charitable events. This is a case in which summary judgment was granted because this appellant refused to produce discovery and refused to answer relevant questions in a deposition. We've cited in our record where the witness said, I won't tell you that today. I will only tell the judge when I'm sitting on the stand. I admit that I would have liked to have seen a more fulsome order. But orders, one, it was not appealed on this basis, which you can reasonably infer means that this appellant understood what the order was when his lawyer raised the issues on appeal that did not include that. But orders, summary judgment was granted for the very specific and complete list of issues that we filed with the court and had an evidentiary basis for. And so on that point, Your Honor, Judge Cox made specific reference to what the basis was. And I think you need to take the totality of the record. The issue that summary judgment was So we're supposed to dig through the 3,000 pages that you submitted and find the facts that support the granting, the one sentence granting of your motion. Is that what you're saying? If you came to me at a trial court and said, Judge, here's a transcript of a 200-page transcript of a deposition. The testimony is in there. What would we do with that? I completely understand the point you're making, but Your Honor, I'm going to tell you why I don't think those are the facts at hand. First of all, I think I've already said that that wasn't an issue identified by this appellant. I have to engage in de novo review. How am I supposed to do that here? I'm going to answer your question because I don't mean to be argumentative, but I do think the appellant, while it's a de novo review, I think the appellant bears a burden of persuasion. And that burden of persuasion was not met here. But let me answer your question. There is a context to that order that's contained in other relevant orders, including a very closely related discovery sanctions order. What this appellant sought by way of the that was superior in position to that of MPRI. He refused and was otherwise unable to provide any evidence to the court of the existence of such a note or the existence of underlying facts that would support that note. Judge Cox said, if you do not present it, produce evidence by a date certain by way of a motion to compel, it will be excluded for purposes of consideration. No such evidence was found. Judge Cox found in the context of this case that no such evidence was produced by the deadline, must be excluded. And I believe it was an appropriate thing for her to do to say you cannot prevail and you lose on your declaratory relief claim for a secured claim upon which no evidence can be found in the record. I think it is. I think it is not only inappropriate. I think it would be an unfair shifting of the burden to say that the lack of evidence or proving a negative is imposed upon MPRI in this case in the context of a summary judgment motion. These were these were cross motions for summary judgment on the same facts. And I think that's a key distinction in that I would attempt to persuade you, Your Honor, in analyzing the context of this order. Both parties sought summary judgment on the same issue, and they both understood the same record to exist. At the end of the day, Mr. Mr. Garment. Yes, Your Honor. Oh, dear. Something's happened to Judge Niemann. I hope it's not me. It is not you. We can hear you. Judge Niemann is frozen. Let's see if we can get her back. I've temporarily stopped the clock. Thank you. Sorry about that. I'm my the computer. I've got the connection is unstable. Okay, we've got you back. And we stopped the clock while you were gone. So no, no problem. Thank you. Um, what was I gonna say? Oh, Mr. Garment. I correct me if I'm wrong. But was was you said that there was the same set of facts, but I thought that there was a separate statement of there was a statement of undisputed facts and then MPRI objected to certain of the facts of Mr. Drexler is am I misremembering? No, the posture. I'm sorry. I didn't mean to cut you off. There was a delay there. The posture of what you said is correct, but the context of it is important. Mr. Drexler, in his separate statement of undisputed facts said it was undisputed that a underlying note existed and that funds were paid against that underlying amount. That was evidence that was excluded by order of the court because it was not produced in the year discovery and refused to be answered. And so the actual record that was considered by the court contained exclusions based upon that order that discovery had not been complied with. The underlying facts that were decided by the court is the existence of an intercreditor agreement. What the intercreditor agreement said, it clearly said that any claim of Mr. Drexler was subordinated to the superior secured claim of MPRI. But Mr. Drexler had asserted that there were facts in which would give rise to a basis for him to invalidate the intercreditor agreement. And Judge Cox found that no such facts had been put forth and no such basis for a legal determination had been put forth. So moving on, Your Honor, Your Honors, at the end of the day, I think the presentation that you heard was one in which Mr. Drexler admitted that he did not participate in discovery, did not want to answer questions as they related to the discovery sought in connection with the motion for summary judgment. And he believes that he is entitled to a trial, notwithstanding the fact the judge determined that there were no issues for us to try at trial. There are allegations made of interference with counsel. Not only is there no record for that, the representations, I believe, are incorrect and that there is a firm who chose not to represent Mr. Drexler and make an appearance in this case. I have no ability to do anything other than go beyond the record to say, in response, that counsel had a conflict and represented one of the members of our group, and we simply raised that issue with counsel. But again, I am beyond the record, undeniably, because there was no record to support that allegation. Finally, an argument is made that this is a complicated case and the size of this case justifies foregoing, for lack of a better term, summary judgment motions and we should simply do this at trial. This is a trial that had been extended a number of times. There was no effort to deny Mr. Drexler continuances and pre-consented to continuances of the trial based upon the fires. The discovery that was the basis for all of the motion practice and trial concluded before the fires began. The judge, as is set forth in the record, did continue the trial based upon the fires that existed. At the final question by the judge as to whether or not the trial date needed to be extended further, appellant's counsel said, no, we're ready to go. We don't need a further extension of trial. I believe that that cuts off any allegation that the court was insensitive to or denied appellant due process based upon the timing of the fires. Wrapping up my argument for the panel, I believe you've heard a presentation consistent with the about animosity with an employee of my client. The animosity alleges that he inserted himself in management, something that the record cannot be pointed to because that fact does not exist. The existence of an Article 9 sale before bankruptcy. I will highlight that the record only establishes that Mr. Drexler was the CEO of the debtor who voluntarily chose to file bankruptcy himself. He picked his own professionals and counsel and now suggests that those counsels, those professionals led him down the wrong path. Any allegations you hear about my client making a death threat or similar things are simply, regrettably, they are untrue is the most kind way to put it. In fact, the threats of exactly the opposite were to be found by Judge Cox, finding that Mr. Drexler was engaged in an ongoing and widespread effort to threaten and harass employees of Emory and their spouses who have no relationship to the business other than being having been made by the court. But I believe that that order can and should be taken in the context of all of the orders that were close by, including discovery sanctions orders and including the temporary restraining order and the fact that cross motions for summary judgment were brought in upholding it. And I believe that the fact that that issue was not appealed by the appellant, not identified by his lawyer, not sought reconsideration under Rule 56 motion is all evidence that stands for the proposition that while those best practices might prove to a longer order in certain circumstances, there is nothing to suggest that the parties before this court did not understand the basis of Judge Cox's order. And unless the panel has any further questions, I'll yield the remainder of my time. I have no questions. Anybody else? Thank you, Mr. Drexler. Yes, I'm going to finish up and I think the most important thing is my claim. At the beginning of the bankruptcy, I put a proof of claim, which no one fought me on. It went through a lot of part of the year. The only time that someone asked for any proof of my claim is when the plan was not confirmed. The reason why that happened is because everyone knew I put money into the company. I put real money into the company because that would have been the time. At that time to say, OK, I was the first one to put a proof of claim, first one to put a proof of claim, and that was literally probably three months into the bankruptcy. Embry and the Garmin firm asked me for that proof of claim a year later. And what Mr. Garmin isn't saying is I produced, maybe late, I produced all the records. And I'm not going to go into why I was late or why I wasn't. But the Garmin firm has every bank record, every bank record and every dollar I put into the company. So, yes, I was late, but the money was put into the company and. Everyone received that, and yes, it was late, I admit that, and I'm not going to go into the reasons why it wasn't and that's not for what we're doing here, but all I'm asking is, as Mr. Garmin even knows, this is a complicated, a very complicated case. There's a lot of moving parts. I just asked my right to have a trial just as I thought I was going to. And I didn't have I didn't have a trial. I believe it was unfair to have a summary judgment at that point in the case. In the beginning, I would understand. But at that point of the case, I was I was relying on to have a trial and bring my case forward and a summary judgment did not allow me to do that. So I'm asking the panel. And again, as you see, there's, you know, twenty thirty thousand documents. There's a lot of documents in this case. And the important part is I did put the money in the company. The Garmin firm has all my numbers that I did. They can't deny that. And no one fought me on my proof of claim for literally a year. And the only time they did is when they didn't get that plan approved. So that is my closing comments. I thank you for your time and thank you very much. All right. Thank you both for your good arguments. This matter will be submitted. We will issue a decision promptly. Thank you very much. Madam Clerk, would you please call the next case?
judges: Brand, Corbit, and Niemann